## EX PARTE DANIEL LUCAS.

In Banc, February 19, 1901.

1. **Revenue:** APPROPRIATIONS: COMPENSATION OF COMMISSIONERS: LICENSES. Section 5037, Revised Statutes 1899, providing that the members of the board of examiners for barbers shall each receive a compensation of $3 per day for his services and necessary traveling expenses, which shall be paid out of any money in the hands of the treasurer of the board, is not in conflict with section 43, article 4, Constitution of Missouri, providing that the General Assembly shall have no power to divert any revenue received by the State, or to permit money to be drawn from the treasury except in pursuance of regular appropriations made by law, since the money authorized to be collected under the act is not State revenue.

Ex parte Lucas.

2. **License Commissioners:** APPOINTMENT: LIMITATION ON GOVERN-
OR'S PREROGATIVE, HOW RAISED? Section 5035, Revised Statutes 1899,
creates a board of examiners for barbers, and provides that the Gov-
ernor shall appoint one member each from those recommended by the
State Barbers' Protective Association, The Boss Barbers' Protective
Association, and the Journeyman Barbers' Union. *Held,* that a per-
son arrested on complaint of such board for pursuing the occupation
of a barber without license can not object that such method of ap-
pointing the board is unconstitutional because it limits the Gov-
ernor's privilege of appointment to persons recommended by the
unions specified, since the Governor alone can make that objection.

3. ———: ———: ———: ON RECOMMENDATION: CONSTITUTIONALITY.
Such restriction of the Governor's power of selection is authorized
by section 9, article 14, of the Constitution, providing that the ap-
pointment of all officers not otherwise directed by the Constitution
shall be made in such manner as may be prescribed by law, since
the Constitution does not prescribe how such board shall be ap-
pointed.

4. ———: ———: FAILURE TO RECOMMEND. The refusal of the unions
to recommend any persons for appointment would not have the ef-
fect to repeal the law.

5. ———: ———: RIGHT OF VIOLATOR. The rights of a barber who vio-
lates said law are not invaded by the method of appointing the board of
examiners on the recommendation of certain unions.

6. **Laws:** NO EMERGENCY: WHEN IN FORCE: WORDING OF ACT. The Bar-
bers' Act of 1899 creates a board of examiners for barbers and makes
it unlawful for any barber in a city of 50,000 inhabitants, to pursue
the occupation of a barber unless he procures a license from such
board "within ninety days after the approval of the act." The Con-
stitution declares that, unless an emergency clause is attached, no
law, except appropriation bills, shall take effect until ninety days
after the adjournment of the session at which it was enacted. *Held,*
that the term "within ninety days after the approval of the act"
must be considered a technical term, having a peculiar and appro-
priate meaning in law, and understood under the Constitution to
mean ninety days after the act can and does constitutionally take
effect, that is, the ninety days within which the licenses were to be ob-
tained did not begin to run until ninety days after adjournment;
hence the act is not objectionable as limiting the time for acquiring
a license to a period which expired before the act took effect.

Ex parte Lucas.

7. **Barbers' Act:** SPECIAL LEGISLATION: APPLICABLE TO CITIES OF 50,-000 OR MORE. Laws 1899, page 44 (R. S. 1899, chap. 78), regulating the occupation of barbers, in section 1 provides that the provisions of the law shall not apply to barbers in any city, town, or village containing less than 50,000 inhabitants. *Held,* that the act is not unconstitutional, as special legislation, since there are already several cities to which it applies, and it is a continuing act, which will apply to all other cities attaining the specified population, and the necessity for regulating the occupation of a barber is greater in a large than in a small city.

8. ————: PUBLIC HEALTH MEASURE. The purpose of the Barbers' Act is clearly to so regulate the business of barbering as to prevent the spread of contageous diseases, and being such it is a police regulation whose tendency is to promote the public health. It is bottomed on the same principle as the acts relating to physicians, embalmers, osteopaths and dentists.

9. **Laws:** TESTING CONSTITUTIONALITY BY HABEAS CORPUS. Where a person is arrested for violating the provisions of the Barbers' Act (R. S. 1899, chap. 78), which declares it unlawful to follow the occupation of a barber without first obtaining a certificate of registration, he may contest the constitutionality of the law by habeas corpus. (BURGESS, C. J., SHERWOOD, MARSHALL and GANTT, JJ., concur in separate opinion by SHERWOOD, J.; ROBINSON, BRACE and VALLIANT, JJ., concur in a dissenting opinion by VALLIANT, J.)

*Habeas Corpus.*

PRISONER REMANDED.

*Hamner & Hamner* for petitioner.

(1)   This court has decided that it will at any stage of criminal proceedings, and even after judgment, interfere by means of the writ of habeas corpus to look into and investigate the constitutionality of a statute. Ex Parte Smith, 135 Mo. 223. (2)   Chapter 78, Revised Statutes 1899, is void and unconstitutional as being in violation of section 53 of article 4 of the Constitution, for the reason that it is a special law,

intended to regulate the affairs of existing cities of a population of 50,000 inhabitants, with provisions in it not applicable to cities which may come into existence in the future. Section 7 contains all the provisions as to how those who were engaged in the barber trade at the time of the passage of the act may get certificates of registration. By said section it is provided that "every person now engaged in the occupation of barber in this State shall, within ninety days after the approval of the act," get out a certificate of registration, and provides for a renewal of such certificate on January 31, 1900. No provision is made by which those who were practicing the trade at the time of the passage of the act, and who might fail, for any cause, to get out a certificate within ninety days after the approval of the act, can ever afterward get certificates, and consequently by section 1, such barbers failing to get out certificates within the prescribed time, are forever barred from practicing their trade except in cities of less than fifty thousand inhabitants. So that it can be seen from this, that the act was intended to apply only to existing cities, and to operate in the present and on an existing state of facts, and is therefore void. State ex rel. v. Herrmann, 75 Mo. 340; State ex rel. v. Co. Ct. Jackson Co., 89 Mo. 237. (3) The act is void for the reason that it is in violation of section 30, article 2, Constitution of Missouri, and of the fourteenth amendment to the Federal Constitution, and also of the fifth amendment to the Federal Constitution. For, if a barber practicing his trade at the time of the passage of the act, should, as petitioner has done, with a view to test the law, in good faith fail to take out a certificate within the prescribed ninety days, or by reason of severe sickness or for other cause fail to get out a certificate of registration within the prescribed ninety days, he would be forever deprived of the right to follow his trade except in cities of less than 50,000 inhabitants. Indeed the act declares that certificates must be applied for within ninety days after the ap-

proval of the act by persons practicing the barber trade at the time of the passage of the act, otherwise they can never practice the barber trade in cities of 50,000 or more, and yet the act never took effect until more than ninety days after the approval of the act, for the act was approved May 5, 1899, and the Legislature adjourned on the twenty-second day of May, 1899, and the Constitution (article 4, sec. 36), provides that, "no law passed by the General Assembly, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of an emergency (which emergency must be expressed in the preamble or in the body of the act), the General Assembly shall, by a vote of two-thirds of all the members elected to each house, otherwise direct; said vote to be taken by yeas and nays, and entered upon the journal."     State v. Julow, 129 Mo. 163; State v. Walsh, 136 Mo. 406.     (4) Section 2 of the act under consideration, which relates to the appointment of a board of examiners for barbers, makes an unreasonable classification of the citizens of Missouri for eligibility to office, requiring that persons to be eligible to such office must be recommended by certain unions, when there is no more sense to such a test than that they should be members of some religious society or recommended by it, and as this court can not amend the law to make new or different provisions for officers to enforce the law, the whole law is void. Evansville v. State of Indiana ex rel. Blend; 4 L. R. A. 97. The appointment to office is the exercise of an executive or administrative function and must be conferred upon some executive or administrative officer.   In order that each of the three branches of the government may be enabled to maintain its independent existence, the officers of each department must be appointed and selected by the department in which he is to work.   If the Legislature can not select an executive or judicial officer, neither can it delegate the selection thereof to some one

outside of the executive or judicial department.    State ex rel.
v. Hyde, 13 L. R. A. 83; State ex rel. v. Dennet, 4 L. R. A.
81.    (5) Section 2 provides that the Governor shall appoint
such persons as certain unions may recommend.    That is
nothing more than commission those whom the unions appoint,
rather may appoint.    There is no duty laid upon the designated
unions to appoint anybody, and so it is left open for these
unions to in effect repeal the law by failing to recommend any-
body, and thereby render the law nugatory.    It is conferring
legislative privileges upon these unions, and is in violation of
section 53 of article 4 of the Constitution, where it provides
that the Legislature shall not pass any local or special law
granting to any corporation, association or individual any
special or executive right, privilege or immunity, etc.    (6)
The act under consideration provides that the various fees for
examination and license shall be paid to the treasurer of the
board, and section 43 of article 4 is hereby violated, which
provides that "all revenues collected and moneys received by
the State from any source whatsoever shall go into the
Treasury, and the General Assembly shall have no power to
divert the same, or to permit money to be drawn from the
treasury except in pursuance of regular appropriations made
by law," etc.

*Dodge & Mulvihill* for Board of Examiners.

(1)    In order to provide for the safety and care of a
people, and prevent disease, it is competent for the Legislature,
in the interest of public health, to pass a law regulating the
occupation of barber, and prescribing the qualifications for
the practice of such occupation.    Wilkins v. State, 113 Ind.
514; State v. Vandersluis, 42 Minn. 129; Gosnell v. State, 52
Ark. 228; State v. Zeno (Minn.), 43 N. W. 749.    (2) The
nullity of the Act of 1899 must appear beyond a reasonable

Ex parte Lucas.

doubt before it will be declared unconstitutional. Ewing v. Hoblitzelle, 85 Mo. 69; Deal v. Mississippi Co., 107 Mo. 464. The court will not declare a law unconstitutional unless its unconstitutionality is clearly and certainly made to appear. State v. Able, 65 Mo. 357; State ex rel. v. Pond, 93 Mo. 606. (3) "A statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special." The act in question is beyond all doubt general, as it applies to all alike who come within its purview; there is no attempt to divide a natural class or to apply any of its provisions to particular persons or things of a class. State ex rel. v. Tolle, 71 Mo. 650; State ex rel. v. Herrmann, 75 Mo. 354; Lynch v. Murphy, 119 Mo. 163.

MARSHALL, J.—This is a proceeding by habeas corpus, to test the legality of the imprisonment of the petitioner by Samuel Chiles, marshal of Jackson county, under an information filed in the criminal court of Jackson county by the prosecuting attorney of that county, charging him with practicing the occupation of barber without having procured a certificate of authority so to do from the State Board of Examiners for barbers, contrary to the provisions of chapter 78, Revised Statutes 1899, being "An Act to establish a board of examiners and to regulate the occupation of a barber, in this State, and to prevent the spreading of contagious disease," approved May 5, 1899. [Laws 1899, p. 44.]

The petitioner has not yet been tried on that information, but pending the trial, he applied to one of the judges of this court, and obtained the writ of habeas corpus. The petitioner asserts that the Act of 1899 is unconstitutional and void, and therefore there is no law or authority warranting his arrest, detention or prosecution, and hence he is entitled to have his liberty restored to him by this great writ of right, which the Constitution of this State (sec. 26, art. 2) declares shall never

be suspended. The Act of 1899 is claimed to be in conflict with section 53, article 4, section 1, article 6, section 3, article 10, section 4, article 2, section 30, article 2, section 43, article 4, section 5, article 9, section 28, article 4, the whole of article 3 of the Constitution of Missouri, and with the fourteenth amendment to the Constitution of the United States, and with section 2, article 4, of the Federal Constitution.

If the act offends against so many provisions of the organic law of the United States and of the State of Missouri, the petitioner is suffering a grievous wrong by being arrested, cast into prison, compelled to stand trial and employ counsel to defend him, simply because he has offended against its provisions when the act itself is a greater offender against the law than he is against the act.

The particular points relied on by petitioner as affecting the unconstitutionality of the act are: First, that it is a special law, because it applies only to such cities as now have a population of 50,000 and does not apply to such cities as may hereafter attain such a population; second, that it requires all barbers who were practicing their trade on the date of the passage of the act (May 5, 1899) to apply to the board of examiners for a certificate within ninety days thereafter (which time would expire August 5), and as the law did not take effect until August 22 (ninety days after the General Assembly adjourned on May 22), the Governor could not appoint a board of examiners until that time, and therefore there could be nobody to issue a certificate. Or otherwise stated, the act requires barbers who were practicing their trade on May 5 to obtain a certificate by August 5, when there could be no board authorized to issue such a certificate until August 22, or until seventeen days after the expiration of the time limited by the act for such barbers to obtain a certificate. The result is claimed to be that barbers who were practicing their trade

Vol. 160 mo—15

on May 5, 1899, were effectually barred from ever afterwards practicing their trade in any city having over 50,000 inhabitants, and would be compelled to move to cities having less than 50,000 inhabitants in order to practice their trade; third, that the act requires the Governor to appoint a board of three examiners, one to be recommended by the Missouri State Barber's Protective Association, one by the Boss Barber's Protective Association and one by the Journeymen Barber's Union, all, however, subject to approval as to qualifications by the State Board of Health, and this method of appointing is claimed to interfere with the division of powers between the legislative and executive branches of the government; and further because it requires a recommendation from such unions as a condition precedent to the right of the Governor to appoint, it is asserted that it might in effect repeal the law because such unions might refuse to recommend any one, and because in this way legislative functions are delegated to these unions; fourth, that the act provides that the board of examiners shall receive a compensation of three dollars a day and railroad and traveling expenses to be paid out of any money in the hands of the treasurer of the board, and this is asserted to be in conflict with section 43, article 4 of the Constitution, which provides that all money received by the State from any source whatever shall go into the treasury of the State and shall not be drawn out except pursuant to a regular appropriation made by law.

These propositions will be considered in the inverse order of their statement, so disposing of the least meritorious first.

The fourth contention is not well founded for the simple reason that section 43 of article 4, applies only to money provided for and received by the State. The money authorized to be collected under this act is not State revenue, but is simply a provision to make the board of examiners self-supporting.

The third contention is one which is not available to the

petitioner.   If the act is unconstitutional because it limits the Governor's privilege of appointment to persons recommended by the unions specified, the Governor alone could object.   If he does not do so no one else can complain.   That no such trouble has arisen under this act is shown by the fact that it appears that in fact the Governor has appointed a board of examiners—whether they were recommended by such unions or whether the Governor treated that provision of the act as unconstitutional and appointed such persons as he chose does not appear—and that this prosecution is at the instance of that board.   No right of this petitioner has been invaded by the method of appointment provided by this act.   But it may be observed, *en passent,* that section 9 of article 14, of the Constitution provides:   "The appointment of all officers not otherwise directed by the Constitution shall be made in such manner as may be prescribed by law," and that the Constitution does not prescribe how the board of examiners for barbers shall be appointed.   The conclusion follows that it was competent for the General Assembly to provide the manner, form and conditions precedent for their appointment, and in so doing no constitutional prerogative of the Governor was infringed or impaired.

The fact that the unions might refuse to recommend any persons for appointment would have an effect upon the practical working of the law, but not upon the law itself.   But no such refusal could interfere with the operation of the law, for the parties could be mandamused and compelled to act.   [City v. Weitzel, 130 Mo. 620.]   The law would not be repealed by such refusal.   The same result would follow if the power to appoint had been conferred upon the Governor and for any reason he saw fit not to make the appointment.   His refusal would not have the effect to repeal the law. Nor does such a contingency render the act obnoxious to the objection that it is a delegation of legislative power.   The act, whatever its force and practical efficacy may be, is the product

of legislative will.    Whether the instrumentalities provided
for its enforcement are adequate or not does not take away from
its constitutionality as a legislative enactment.

The second contention, that the time limited for barbers
practicing their trade at the time of the passage of the act to
qualify expired seventeen days before the act took effect or
before the board of examiners could qualify them, and there-
fore the act is a prohibition levelled against all barbers who
were so practising their trade from ever afterwards following
their occupation except in cities of less than 50,000 inhabitants,
is the necessary deduction from following the rule of construc-
tion expressed in the maxim, *"Qui haeret in litera, haeret in
cortice."*

Section 36, article 4 of our Constitution provides:    "No
law passed by the General Assembly, except the general appro-
priation act, shall take effect or go into force until ninety days
after the adjournment of the session at which it was enacted,
unless in case of an emergency (which emergency must be
expressed in the preamble or body of the act), and the General
Assembly shall, by a vote of two-thirds of all members elected
to each house, otherwise direct," etc.    Section 6595, Revised
Statutes 1889, is to the same purport.

Under this constitutional provision the General Assembly
can not make a law take effect from its passage except by
declaring an emergency.    No emergency was declared in this
act.    Therefore, the act took effect ninety days after the
adjournment of that session of the General Assembly, to-wit,
ninety days after May 22, 1899, and the barbers had ninety
days after the act took effect to qualify.    The statement in the
act, that they should qualify ninety days after the "approval
of this act," as it appears in the Session Acts, or after the
"approval of this chapter," as it appears in section 5040, chap-
ter 78, Revised Statutes 1899, must therefore be considered
technical terms having a peculiar and appropriate meaning in

law and must be construed according to their technical import, as is required by section 4160, Revised Statutes 1899, in construing laws. That is, those words must be understood under the Constitution to mean ninety days after the act can and does constitutionally take effect in the absence of a declared emergency.

The conclusion is illuminated by reference to section 4155, Revised Statutes 1899, which declares that the words "heretofore" and "hereafter" in a statute shall be construed to have reference to the time when the statute took effect. The words "prior to the passage" in a legislative act was construed in Charless v. Lamberson, 1 Iowa, l. c. 443, to mean the same thing, as "heretofore," and under the statute of that State, exactly like section 4155 of our statutes, the words "prior to the passage" and "heretofore" being synonymous, they were held to relate to the time of the taking effect of the statute and not to the time of its actual passage, for, as was said in that case, "to say that section 1249 took effect from its passage, would be to violate an express provision of the organic law, as well as the code itself."

The converse is true where the Constitution contains no such provision postponing the taking effect of the act. There "from its passage" means from and including the whole day it actually passed—not even deferred until the day of its approval by the President, if it is a Federal statute, or by the Governor, if it is a State statute. [United States v. Williams, 1 Paine's C. C. Repts. 261; Eliot v. Cranston, 10 R. I. 88; Johnson v. Fay, 16 Gray (Mass.), 144.]

As the Act of 1899, under consideration, did not take effect until August 22, and as the relator and all others similarly situated had ninety days after that time to qualify, the direful consequences so graphically pictured by counsel are dissipated, and the law is stripped of this objection to its validity.

This leaves for decision the first objection, to-wit, that the act is a special law, and that it can only apply to cities having 50,000 inhabitants at the time it took effect and not to such as might thereafter attain that population.

What is and what is not a special law has passed into final adjudication by the many decisions in this State holding that "a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special." [Lynch v. Murphy, 119 Mo. 163; Owen v. Bauer, 154 Mo. l. c. 477, and cases cited.]

The act in question is general and prohibitive. It provides: "It shall be unlawful for any person to follow the occupation of a barber in this State, unless he shall have first obtained a certificate of registration, as provided by this act," etc. So far it applies to every one in the State. It is exactly like the act of 1897 relating to dentists (article 3, chapter 128, section 8525, Revised Statutes 1899); like the doctors act, (article 1, chapter 128, sections 8507 and 8517, Revised Statutes 1899); like the act relating to osteopaths (article 4, chapter 128, section 8537 et seq., Revised Statutes 1899); and the embalmers act (chapter 103, sections 7375 and 7378, Revised Statutes 1899), And even lawyers are subject to quite as much regulation and examination (chapter 73, Revised Statutes 1899).

The act clearly, so far, is general and not special. The next provision of the act is a proviso, which is as follows: "Provided, however, that nothing in this act contained shall apply to or affect any person who is now actually engaged in such occupation, except as hereinafter provided." The only provision is that he shall file with the secretary of the board of examiners, an affidavit setting forth his name, residence and the length of time during which and the place where he has practiced such occupation, and pay the treasurer one dollar, and thereupon he shall receive a certificate entitling him to

practice such occupation for the fiscal year ending January 1, 1900; and this certificate he is entitled to have renewed every year by making application within thirty days after its expiration and by paying one dollar.

There is nothing special in the character of this provision.

Section 1 of the act, however, closes with this additional proviso: "Provided that the provisions of this law shall not apply to barbers in any city, town or village containing less than 50,000 inhabitants." And it is asserted that because it does not cover cities that may hereafter attain a population of 50,000 inhabitants, it is obnoxious to the charge of being a special law, as defined in State ex rel. Harris v. Herrmann, 75 Mo. 340, and State ex rel. v. County Court of Jackson County, 89 Mo. 237.

In Herrmann's case the act was held to be special because it applied only to cities of 100,000 inhabitants, and St. Louis was the only city that at that time filled this description, and only to such notaries as held commissions bearing date prior to the passage of the act.

In the Jackson county case, the act was held special because it attempted to establish reform schools for juvenile offenders "in all counties in this State," in which there is located a city of over fifty thousand inhabitants," and Kansas City was then the only city in the State that filled this designation, and therefore, as the act was intended to act only presently and not prospectively, it could never apply to any county except Jackson. But neither of the acts construed in those cases are like the act involved in this case. Here the act on its face, by its terms and under the machinery it provides, treats not only of the present, but deals with the future. It creates a permanent board of examiners. It permits barbers who are practicing their vocations at the date of the act to continue to do so, simply requiring them to apply for a certificate each year thereafter. It deals with barbers who were

not then practicing that vocation, but who might want to do so at any time thereafter, by requiring them to be examined by the board as to their qualifications, among them that such applicants must be "possessed of sufficient knowledge concerning the common diseases of the face and skin to avoid the aggravation and spreading thereof in the practice of said trade." In fact, its purpose, expressed not only in the title of the act, but all through its body, is to regulate the business and to prevent the spread of contagious diseases, and these purposes are clearly within the police power of the State and tend to promote the health of the people. In short, the act is bottomed upon the same legal principles as the acts in reference to physicians, embalmers, osteopaths and dentists, and is evidently modelled after and follows closely the lines of the Act of 1897 relating to dentists. If this act is not a valid police regulation, then all those other acts also fall. A similar act regulating the practice of dentistry was held valid in Indiana (Wilkins v. State, 113 Ind. 514), in Minnesota (State v. Vandersluis, 42 Minn. 129), and in Arkansas (Gosnell v. State, 52 Ark. 228).

The case of State v. Zeno, 81 N. W. Rep. 748, decided by the Supreme Court of Minnesota on the fifth of February, 1900, construed a statute of that State regulating barbers, that is so nearly like the Act of 1899 as to create the impression that our statute was modelled after the Minnesota law, or else that both emanated from the same mind, for in all their essential features (except the exception in favor of cities having less than 50,000 inhabitants) the two acts are the same. What is said in that case applies so well to this that I adopt the following portion of the opinion:

"The question in this case is, is it competent for the Legislature to prohibit persons from practicing the calling of a barber without first obtaining a license or certificate of registration? Laws enacted for the purpose of regulating or throwing

restrictions around a trade, calling, or occupation, in the interests of the public health and morals, are everywhere upheld and sustained.    Such laws are within the police power of the State, and are universally sustained where enacted in the interests of the public welfare.    The question presented in cases where the validity of such laws is called in question is no longer the power or authority of the Legislature to enact them, but whether the occupation, calling or business sought to be regulated is one involving the public health and interests.    A person engaged in such an occupation is not alone interested therein.    The public served by him is also interested.    He is interested to the extent that it provides and furnishes him with employment and a means of livelihood.    The public is interested in his competency and qualifications, and it is eminently proper that there be thrown around the calling, protection from intrusion by incompetents and others inimical to the public good.    It is unnecessary to discuss the grounds upon which such laws are upheld, or the objections urged against them. Counsel for defendant ably present their side of the question, but the authorities are all against them.    We cite, as pertinent to the question, State v. Medical Examining Board, 32 Minn. 327, 20 N. W. 238; State v. State Board of Medical Examiners, 34 Minn. 387, 26 N. W. 123; Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; People v. Warden of City Prison, 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718; Singer v. State, 72 Md. 464, 19 Atl. 1044, 8 L. R. A. 551; Dent v. West Virginia, 129 U. S. 121, 9 Sup. Ct. 231, 32 L. Ed. 623.

"Is the occupation of a barber a calling or trade involving to any degree the public health and public good?   If it is, the law must be sustained.    We hold that it is, and that the health of the citizen, and protection from diseases spread from barber shops conducted by unclean and incompetent barbers, fully justify the law.    It is a fact of which we must take notice that

the people of to-day come in contact with, and engage the services of, those following the occupations of barber, as much as, if not more than, any other occupation or profession. We must take notice of the fact, too, that the interests of the public health require and demand that persons following that occupation be reasonably familiar with, and favorably inclined towards, ordinary rules of cleanliness; that diseases of the face and skin are spread from barber shops, caused, no doubt, by uncleanliness or the incompetency of barbers. We must take notice of the fact that to attain proficiency and competency as a barber requires training, study, and experience—training in the art, and study and experience in the management and conduct of the calling. A design and purpose to protect the public from injurious results likely to follow from such conditions is the foundation of statutes like this. And, as we must take judicial notice of the foregoing facts, the foundation for this law is apparent. And it may be said, further, that there is as much reason for a law of this kind as to barbers as there is for such a law as to dentists, pharmacists, lawyers, and plumbers. It is enacted in the interests of the public health and welfare, and we sustain it."

This would be decisive of this case were it not for the last provision of section one of the act which limits the operation of the law to cities of this State, containing a population of more than 50,000 inhabitants, and the effect of that provision upon the law is the only remaining question in the case.

This act is unlike the acts construed in the Herrmann case and the Jackson county case, in this, that in those cases the acts could never apply to any city except St. Louis (or to any notary unless his commission was dated prior to the act) or to Jackson county, respectively, while this act would apply to St. Louis, Kansas City and St. Joseph, at any rate, even if it be construed that the words "containing 50,000 inhabitants," mean having that population at the date of the passage of the

act, and hence the act is not local, or if these words be construed to mean containing such a population at the time an offense is charged to have been committed, the act is clearly not local or special.

The act does not expressly limit its operation to cities that "now" contain, or that contained at the date of the passage of the act, such a population. The language is "that the provisions of this law shall not apply to barbers in any city, town or village *containing* less than 50,000 inhabitants."

The whole law must be construed together. [State ex rel. v. Marion Co. Ct., 128 Mo. 427; State ex rel. v. Slover, 126 Mo. 652.] The intention of the Legislature must be ascertained and enforced if legal. [State v. Sibley, 131 Mo. 519.] The act must be construed as having a prospective operation unless the contrary intent is plainly manifest. [State ex rel. v. Wofford, 121 Mo. 69.] So interpreted it is plain that it was the intention of the lawmakers, when using the word "containing," to cover not only the present conditions, but the future conditions also. Not only those cities that now have that population, but also such as may have such a population at any time hereafter. The whole scheme of the act is to protect the health of the people in large cities. The Legislature must be presumed to have known that there is more disease where large numbers of people are congregated, and more probability of the spread of disease in large and closely settled cities, than there is in the country or in a small town. History shows that there is greater need of stringent police regulations of all kinds in large than in small cities. It is not unreasonable to believe that the wisdom and experience of the lawmakers may have taught them the greater necessity for regulations to prevent the spread of contagious diseases through barber shops in large cities, than exists for such regulations in smaller places. The line must be drawn somewhere. Here it was drawn at cities containing 50,000 people. The same reason

which would apply such regulations to cities that now contain 50,000 people would make it necessary to apply them to a city that one, five or ten years hereafter attains that population. The act by its terms is continuing, and intended to be a permanent regulation. It applies now to the three large cities of the State and hence is not within the rules of condemnation laid down in the cases relied on. In a few years, if reasonable expectations are fulfilled, it will apply to Springfield, Hannibal, Sedalia, Joplin, Carthage and Jefferson City. The act is susceptible of such a construction, and it is our duty to place that construction upon it, if by so doing we do not violate the commands of the organic law or settled rules of construction. That it is so susceptible is not only shown by what is here pointed out, but is also clearly apparent from what is so conclusively said in St. Louis v. Dorr, 145 Mo. l. c. 493, et seq., showing that even the adverb "now" as applied to the number of inhabitants of a city to which an act is made applicable, does not necessarily mean at the present time. In this act there is no adverb of time used qualifying the verb "containing."

An act that relates to all cities containing 50,000 inhabitants is a proper classification of natural or artificial persons or subjects, and different regulations for people congregated in such large bodies from those governing people or smaller aggregation, are not illegal or unconstitutional under the Federal or State Constitutions. [Missouri v. Lewis (Bowman's case), 101 U. S. 22.]

The conclusion is irresistible that the act in question is a general law which will continue in force until repealed and apply to all cities that now or hereafter contain 50,000 inhabitants, and therefore it is not a special or local law.

In my judgment the right of the petitioner to raise the question by habeas corpus is settled by the cases of Ex parte Smith, 135 Mo. 223, and Ex parte Neet, 157 Mo. 527.

It follows that the defendant is detained for trial for an

offense against a valid law and therefore he is not entitled to be discharged from custody under this writ, but must be remanded to the custody of the marshal of Jackson county.

*Burgess, C. J.,* and *Sherwood, J.,* concur; *Gantt, J.,* in all except the approval of dissenting opinion in Dorr case; *Robinson, Brace* and *Valliant, JJ.,* concur in remanding prisoner for reasons given in separate opinion of *Valliant, J.*

## SEPARATE OPINION.

VALLIANT, J.—The conclusion reached by the majority of the court is that the prisoner be remanded for trial, and in that conclusion I concur, but for the following reasons only:

The original purpose of the writ of habeas corpus, as its office was described and defined under the act of 31 Charles II, in which form, substantially, it has come down to us, was to give effect to that provision of the thirty-ninth section of the Great Charter of King John, which declared that no individual in the realm should be deprived of his liberty unless his right to the same had been declared forfeited "by the judgment of his peers or the law of the land."    Although it was an ancient common law writ, and although the right to personal liberty was clearly enough defined in the Great Charter, yet such was the opposition of the kings to the enforcement of the right and their influence with the crown judges, the remedy was often denied and the right disregarded.    Blackstone says:    "And yet early in the reign of Charles I, the court of King's bench, relying on some arbitrary precedents (and those perhaps misunderstood) determined that they could not upon an habeas corpus either bail or deliver a prisoner, though committed without any cause assigned, in case he was committed by special command of the king, or by the lords of the privy council. ....... These pitiful evasions gave rise to the statute of 16

Car. 1, c. 10, sec. 8, whereby it is enacted that, if any person be committed by the king himself in person, or by his privy council, or by any of the members thereof, he shall have granted unto him, without any delay upon any pretense whatsoever, a writ of habeas corpus," etc.   Then after pointing out the new shifts and devices that were resorted to by the crown judges to render the writ impotent, the great law-writer adds: "But whoever will attentively consider English history, may observe, that the flagrant abuse of any power, by the crown or its ministers, has always been productive of a struggle, which either discovers the exercise of power contrary to law, or (if legal) restrains it for the future.   This was the case in the present instance (the Jenks case).   The oppression of an obscure individual gave birth to the famous habeas corpus act, 31 Car. 2, c. 2," etc.   [Blackstone's Com., bk. 3, *pp. 134-5.]

Reference to the origin and purpose of this writ is here made to recall to our minds that its office was to afford a man who was imprisoned otherwise than on the judgment of a court, a hearing before a competent court or judge, to the end that the legality of his commitment might be inquired into, and if unlawful that he might be discharged from custody even though the king himself had ordered his imprisonment.   Although the conditions that surround us to-day have materially changed from those that our ancestors contended with at that period of English history, yet in essential principle there is no difference in the office of the writ of habeas corpus now from what it was then.   We have now no kings or privy councils, but we have men in executive authority who sometimes do imprison people without legal right, and who sometimes from overzeal and sometimes from bad motives are induced to use their power to the oppression of the citizen and would confine him in silence and without judicial inquiry, if they were not subject to the writ of habeas corpus.   Therefore the writ is not only preserved in our system of jurisprudence, but ranks

perhaps as the most important in influence, as it certainly is the most famous in history, of all writs known to the English common law.

But where a man is taken into custody under a warrant from a court competent to try him for the offense charged and competent to decide whether or not the act charged is an offense against the law and the court is proceeding in due course with the case, or where it has proceeded to judgment and has adjudged the accused guilty and pronounced the sentence of the law upon him, it can not be said in the language of Magna Charta that he is deprived of his liberty without having been adjudged to have forfeited it "by the judgment of his peers or the law of the land," and therefore the writ of habeas corpus has no place in his case.

If the prisoner is held in custody under process awaiting trial or under commitment awaiting the action of the grand jury, and bail has been refused him, the habeas corpus act expressly provides that he may be brought before a court or judge under this writ and admitted to bail to await his trial, or the action of the grand jury, if it is a bailable case.    [R. S. 1899, secs. 3568-3581.]

But except for the purpose of admitting to bail, the writ of habeas corpus was not designed and should not be issued to interfere with the due procedure in a court of competent jurisdiction.    This is the doctrine announced by this court in its earlier decisions and is the only doctrine consistent with the original purpose of the writ and with the spirit of the habeas corpus act in our statutes and under our State judiciary system, although reason exists for a different view under the Federal judiciary system.

In Ex parte Harris, 47 Mo. 164, the petitioner was under legal process and held for further action of the court and he claimed that he was unlawfully restrained of his liberty because the statute under which he was held was unconstitutional.

The court, per WAGNER, J., after quoting from what is now section 3578, Revised Statutes 1899, which provides that when the prisoner is held on legal process he shall not be discharged except in certain cases, refused to go into the question of the constitutionality of the statute under which the prisoner was held, and said: "The prisoner can have his trial, and if he is dissatisfied with the verdict and judgment, and desires to test the validity of the law, the courts are open to him, as they are to all other persons charged with the violation of the laws of the land. Admit this proceeding, and then every person charged with committing an offense of any kind and description whatsover, instead of standing his trial and litigating the matter as the law directs can come here and ask our advice as to the validity of the law under which he is arraigned. And the Legislature clearly saw the impolicy of the proceeding, when it placed a prohibition upon it."

This decision was approved, and its doctrine reaffirmed in Ex parte Boenninghausen, 91 Mo. 301. In that case it was contended that the Harris case had been overruled in Ex parte Slater, 72 Mo. 102, Ex parte Bethurum, 66 Mo. 545, and Ex parte Crenshaw, 80 Mo. 447, but the court per NORTON, J., pointed out the distinction that in those cases the courts that had issued the process were acting beyond their jurisdiction, and the court in that case remanded the prisoner, refusing to consider the question of the constitutionality of the city ordinance under which he had been convicted in due form.

In Ex parte Mitchell, 104 Mo. 121, the prisoner had been convicted and sentenced in the circuit court for selling intoxicating liquors in violation of what was called the local option law; his contention was that that law had not been adopted in that county and therefore it was no law. The court, per GANTT, P. J., said: "The writ of habeas corpus is not the remedy to correct error of trial courts, and can not be substituted for appeals and writs of error. Every suggestion made

in behalf of the prisoner here could have been made in the circuit court of Marion county, and that court should have had an opportunity of passing upon those questions. This court has a sufficient docket without reaching out and assuming jurisdiction committed by law to other courts." No difference in principle is perceived between that case and one in which the constitutionality of the law is in question; in both, the question is, is the statute under which the prisoner is held a valid law? If, as has been said, an unconstitutional law is no law at all, a law not legally adopted is no law at all. The one is as void as the other, and the circuit court was as competent to decide the status of the one as it was to decide that of the other, and if its decision was wrong in either, the aggrieved party had his remedy in a due and orderly manner.

In Ex parte Swann, 96 Mo. 44, this court, in a habeas corpus proceeding, did consider the question of the constitutionality of the local option law under which the prisoner had been convicted, and after reaching the conclusion that the law was valid remanded the prisoner. But the question of whether it was a proper subject for decision in a habeas corpus case was not referred to, either in the briefs of counsel or the opinion of the court. Whether, if the court had reached the conclusion that the law was unconstitutional and had thus been brought to the question we are now considering, it would have discharged the prisoner in the face of the judgment of the trial court whose jurisdiction was in no respect questioned, may be doubted. That case is referred to in Church on Habeas Corpus, sec. 374, as holding contrary to the other Missouri cases above referred to; if the text-writer's estimate of that case is correct, it is so only because the point is passed over in silence.

Under the judiciary system of this State, any one tried and condemned as for a crime may have the proceedings in his trial reviewed on appeal or writ of error, in which he may have

Vol. 160 mo—16

relief not only against the errors and irregularities, if any, of the trial court, but if he raises the question of the constitutionality of the statute under which he was convicted he may have the judgment of the highest court in the State on that question. And if the point he desires reviewed goes to the jurisdiction of the trial court, the record may be brought here on certiorari and quashed. If therefore under our system any one is left to pine in prison because of error or irregularity in his trial, or invalidity of the law under whch he was convicted, or lack of jurisdiction in the court that condemned him, it is only because he has omitted to avail himself of one of the several remedies the law affords him. There is absolutely no occasion in such case to invoke the remedy by habeas corpus, and it would be a misuse of that writ to so extend it.

Under our habeas corpus act, application for the writ is to be made "to some court of record in term, or to any judge thereof in vacation." No appeal lies from the decision of the court or judge in such case, and the judgment of one such court or judge is of as much force as that of any other. "No person who has been discharged by the order of any court or magistrate, upon a writ of habeas corpus issued pursuant to this chapter, shall be again imprisoned or kept in custody for the same cause." [R. S. 1899, sec. 3598.] In Ex parte Jilz, 64 Mo. 205, the prisoner had been discharged from jail, to which he had been committed by judgment of the criminal court of St. Louis, under a habeas corpus proceeding before a judge of the circuit court; he was rearrested under the same commitment and discharged by this court under habeas corpus on the ground that having been once discharged by the circuit judge, whether rightfully or wrongfully, he could not again be confined on the same judgment. In that case this court per NORTON, J., said: "In proceedings by habeas corpus this court only exercises original jurisdiction, and in issuing the writ and determining the questions arising under it, possesses no more

power than is possessed by a circuit court or a county court, or judge or officer authorized by law to issue the writ," etc.

As our habeas corpus act makes no distinction between the courts or judges who may issue this writ, so it makes no distinction as to who may have ordered the imprisonment, whether it be the successor of the king and his privy council, or the highest court in the land. As the action of the circuit judge in the Jilz case discharging the prisoner confined by judgment of the criminal court, was held to be final, whether right or wrong, so would a judgment under a habeas corpus of a judge of the county court discharging a prisoner held under judgment of this court be final, however erroneous it might be. This goes to show the unwisdom of attempting to apply the writ of habeas corpus to the case of a man in custody under judgment of a court of competent jurisdiction or held for trial under its process except for the purpose of admitting to bail as the act expressly provides. The circuit judge in the Jilz case made a misuse of the writ of habeas corpus; he should not have granted the writ if the facts sufficiently appeared on the face of the petition; or having granted it, he should have remanded the prisoner when it did appear by the return that the petitioner was held under the judgment of a court of competent jurisdiction. But having discharged the prisoner under an erroneous view of the office of the writ, that was the end of the case, as the statute expressly provides (section 3598, supra), and as this court correctly held.

In State ex rel. v. Dobson, 135 Mo. 1, a circuit judge had issued a writ of habeas corpus on the petition of one in jail under conviction in the Jackson County Criminal Court for the crime of murder, the proceedings under that writ were brought to this court under certiorari at the suit of the Attorney-General and quashed. In declaring the law of the case this court per SHERWOOD, J., on page 12, said: "Now, nothing is better established than that the writ of habeas corpus

Ex parte Lucas.

possesses none of the attributes or performs any of the func-
tions of a writ of error, or an appeal, or *certiorari.*"

And again, on pages 16 and 17: "It matters not what
the purpose was or the object in view. In any event the issu-
ance of the writ was in disregard of the plainest statutory pro-
visions and prohibitions, and was the establishment of a prece-
dent most dangerous in its tendencies and innovations, and one
not to be contemplated without the gravest apprehension. Just
look at it. If such a proceeding as this is to be tolerated, after
a man has been duly tried and convicted of murder and judg-
ment rendered and that judgment affirmed by this court, and
the day of its execution set, any *probate* or *county judge* in the
State, may, if the trial has happened in his county, interpose
with a habeas corpus; retry the case on its merits; impeach the
judgment of the trial court and discharge the prisoner, if in his
opinion this be the correct thing to do. The fact that in this
instance the writ has been issued by a judge of a circuit court,
a court of general jurisdiction, does not alter the complexion of
the case in the least, because after all, the sole question to be
answered is: Does the *power* exist anywhere in this State thus
collaterally to impeach the judgments of courts of competent
jurisdiction, and thus to thwart the judgments and mandates
of this court? We are not of the opinion that any such power
or jurisdiction exists or has any foundation either in statutory
law or in legitimate precedents." In the few lines thus
quoted the whole principle governing this subject is compressed
and forcibly expressed, and it follows that this court, exercising
as it does under a writ of habeas corpus original and not appel-
late or supervisory jurisdiction, can no more set at naught the
judgment of a circuit court than can a judge of the circuit or
county court set at naught a judgment of this court. Under
the habeas corpus act all courts and judges are on a plane.

The Supreme Court of California, expressing the same
idea, have said: "Not only that, but, as already suggested,

inferior tribunals would be called upon to review judgments of superior tribunals, and tribunals of equal grade to interfere and review each other's proceedings. Such a rule would render all judicial proceedings amorphous and lead to the utmost confusion and disorder. It is well settled that habeas corpus can be put to no such use, and that its functions, where the party who has appealed to its aid is in custody under process, do not extend beyond an inquiry into the jurisdiction of the court by which it was issued, and the validity of the process on its face." [Ex parte McCullough, 35 Cal. 97.] Although it is said that an unconstitutional law is no law at all, and therefore a conviction under such a law is void, yet whilst that is true in a certain sense, it is inaccurate if by this it is intended to say that the judgment is *coram non judice*. If the court had authority to pronounce the judgment provided the law was constitutional, it had jurisdiction to decide whether or not it was constitutional, and if it decided erroneously the error did not go to the jursidiction of the court. In a decision of the United States Supreme Court, cited in State ex rel. v. Dobson, supra, Chief Justice MARSHALL said: "The question whether an offense was or was not committed, that is, whether the indictment did or did not show that an offense had been committed, was a question which that court was competent to decide. If its judgment was erroneous .... still it is a judgment, and until reversed can not be disregarded." [Ex parte Watkins, 3 Pet. 193, l. c. 203, 206.]

It is in failing to observe the distinction there indicated that has misled some courts in this country to giving sanction to the use if this writ in setting at naught the judgment of a court of competent jurisdiction or interfering with its due process to discharge a prisoner upon the ground that the legislative act under which the prisoner was condemned or is being held for trial is, in the opinion of the magistrate granting the writ, unconstitutional.

A text-writer of ability, formerly Chief Justice of the Supreme Court of Wisconsin, commenting on this point says: "Those who have pretended to treat the subject, as some have, by merely collecting such general expressions, have tended to confuse rather than demonstrate and make plain. They make no distinction between errors of law and errors which are jurisdictional.... It is evident that these distinctions must be observed, or else an intelligent treatment of the subject is not made." [2 Bailey on Jurisdiction, note to sec. 409.]

The right which this writ is intended to secure is that a man shall not be deprived of his personal liberty, in the language of the Great Charter, *"nisi per judicium parium suorum vel per legum terrae,"* but who are his peers if they be not those appointed by law to try his case, and what is the law of the land if it be not that which is solemnly so adjudged to be by the court designated to pronounce the judgment? Can it be that the habeas corpus act is intended to substitute the individual opinion of any magistrate, intrusted by its provisions with the issuance of the writ, for the judgment of a fully equipped court proceeding in solemn form? It would be as wise to do so as to adopt for the measure of equity the ancient illustration of the chancellor's foot or the chancellor's conscience.

The doctrine announced by this court in Ex parte Harris, and Ex parte Boenningausen, above quoted, continued to be the doctrine of this court and was not expressly departed from until the decision in Ex parte Smith, 135 Mo. 223, which has since been followed by a divided court in Ex parte Neet, 157 Mo. 527. There were the cases of Ex parte Swann above commented upon, Ex parte Marmaduke, 91 Mo. 228, and Ex parte Thompson, 117 Mo. 83, but in neither of those was there an express ruling on this question.

The learned judge (SHERWOOD, J.) who wrote the opinion in Ex parte Smith, referred to the decision of the Supreme

Court of the United States in Ex parte Siebold, 100 U. S. 371, and to the text of Church on Habeas Corpus, wherein are collected references to decisions in other States following the Supreme Court of the United States in the Siebold case. But a reading of the opinion in that case shows that although it is founded in reason as applicable to the Federal judiciary, the doctrine announced is in discord with our State judiciary system. The Supreme Court of the United States was there defining its own authority, not under the habeas corpus, as an original writ, but as using the writ in its capacity of an appellate and supervisory court. Because in the case before it there was no appeal from and no writ of error to the U. S. Circuit Court by which the judgment under which the prisoner had been convicted could be reviewed, and no other method prescribed by law by which the validity of the act of Congress under which the conviction was had could be tested in the Supreme Court, that court said it would, under its appellate jurisdiction, review the judgment to that extent on habeas corpus. This is the language of that court as found on page 374: "The question is whether a party imprisoned under a sentence of a United States court, upon conviction of a crime created by and indictable under an unconstitutional act of Congress, may be discharged from prison by this court on habeas corpus, although it has no appellate jurisdiction by writ of error over the judgment. It is objected that the case is one of original and not appellate jurisdiction, and, therefore, not within the jurisdiction of this court. But we are clearly of the opinion that it is appellate in its character. It requires us to revise the act of the circuit court in making the warrants of commitment upon the convictions referred to. This, according to all decisions, is an exercise of appellate power. [Citing cases.] That this court is authorized to exercise appellate jurisdiction by habeas corpus directly is a position sustained by abundant authority. It has abundant power to issue the writ

subject to the constitutional limitations of its jurisdiction, which are, that it can only exercise original jurisdiction in cases affecting ambassadors, public ministers and consuls and cases in which a State is a party; but has appellate jurisdiction in all other cases of Federal cognizance, 'with such exceptions and under such regulations as Congress shall make.' "

Again the court says: "The validity of the judgment is assailed on the ground that the acts of Congress under which the indictments were found are unconstitutional. If this position is well taken, it affects the foundation of the whole proceedings. An unconstitutional law is void and is as no law. A conviction under it is not merely erroneous, but is illegal and void, and can not be a legal cause of imprisonment. It is true, if no writ lies, the judgment may be final, in the sense that there may be no means of reversing it. But personal liberty is of so great moment in the eye of the law that the judgment of an inferior court affecting it is not deemed so conclusive but that, as we have seen, the question of the court's authority to try and imprison the party may be reviewed on habeas corpus by a superior court or judge having authority to issue the writ."

Thus it will be seen that the whole reason on which the United States Supreme Court founded that case is absent in our State law and in our State judiciary system. In the first place, since under our system, as we have seen, no man can be convicted under a legislative enactment without having an opportunity of testing the validity of the act in the highest court in this State, there is no necessity for straining a point in the interest of personal liberty to supply what may have been an oversight in the lawmakers. And in the next place, we can not, as did that court, say that as a superior court and by virtue of our appellate jurisdiction we will review the judgment of an inferior court under a writ of habeas corpus, because as said by NORTON, J., in the Jilz case, supra, with the concurrence of all the judges, in such case this court exercises only

original jurisdiction and "possesses no more power than is possessed by a circuit court or a county court or any judge or officer authorized to issue the writ," and as said by SHERWOOD, J., in the Dobson case, supra, the fact that the writ was issued by a circuit judge did not alter the complexion of the case in the least; it might as well have been issued by a probate or county judge.   We can not declare for ourselves a power under this writ that we must not concede to any court or judge that can issue it.   If by this writ we can set at naught the judgment of a circuit court by the same writ, a judge of the circuit court can set at naught a judgment of this court.   We said in the Dobson case that a circuit judge had no such authority and we must for the same reason say we have no such authority. By adhering to the doctrine in the Harris case, supra, we put no one in peril of his liberty otherwise than "by the judgment of his peers or the law of the land" and by the same means we preserve due order in our courts in the administration of our criminal laws.

For these reasons the decisions in Ex parte Smith and Ex parte Neet, in so far as they hold that the court had authority under the writ of habeas corpus to discharge the prisoners, should be overruled.

And for the same reasons we should not in this proceeding decide the question as to the validity of the act of the Legislature under which the petitioner in this case is held, and since it appears that he is held under due process of a court of competent jurisdiction, he should be remanded to the custody under that jurisdiction.   *Brace* and *Robinson, JJ.,* concur in these views.

### CONCURRING OPINION.

SHERWOOD, J.—In an opinion which has been read in this cause, the "Act to establish a Board of Examiners," etc.,

approved May 5, 1899, has been held constitutional, but there has arisen a difference of opinion among us as to whether habeas corpus is the proper remedy for petitioner who, preparatory to his trial, has been imprisoned on a capias issued upon an information charging violation of the act above cited. On this point, another opinion in this cause has been read before us, in which it has been asserted that in the circumstances stated, petitioner has *no redress by the writ which he has invoked*. A summary of the doctrine thus announced is best conveyed in excerpts from the language employed by the learned writer of the opinion; he says:

"But where a man is taken into custody under a warrant from a court competent to try him for the offense charged, and competent to decide whether or not the act charged is an offense against the law and the court is proceeding in due course with the case, or where it has proceeded to judgment and has adjudged the accused guilty and pronounced the sentence of the law upon him, it can not be said in the language of Magna Charta that he is deprived of his liberty without having been adjudged to have forfeited it 'by the judgment of his peers or the law of the land,' and therefore the writ of habeas corpus has no place in his case.

"If the prisoner is held in custody under process awaiting trial or under commitment awaiting the action of the grand jury, and bail has been refused him, the habeas corpus act expressly provides that he may be brought before a court or judge under this writ and admitted to bail to await his trial, or the action of the grand jury, if it is a bailable case. [R. S. 1899, secs. 3568-3570.]

"*But except for the purpose of admitting to bail* the writ of habeas corpus was not designed and should not be issued to interfere with the due procedure in a court of competent jurisdiction. This is the doctrine announced by this court in its earlier decisions and is the only doctrine consistent with the

original purpose of the writ and with the spirit of the habeas corpus act in our statutes and under our State judiciary system, although reason exists for a different view under the Federal judiciary system.....

"Under the judiciary system of this State any one tried and condemned as for a crime may have the proceedings in his trial reviewed on appeal or writ of error, in which he may have relief not only against the errors and irregularities, if any, of the trial court, but if he raises the constitutionality of the statute under which he was convicted he may have the judgment of the highest court in the State on that question. And if the point he desires reviewed goes to the jurisdiction of the trial court, the record may be brought here on certiorari and quashed. If therefore under our system any one is left to pine in prison because of error or irregularity in his trial, or invalidity of the law under which he was convicted, or lack of jurisdiction in the court that condemned him, it is only because he has omitted to avail himself of one of the several remedies the law affords him. There is absolutely no occasion in such case to invoke the remedy by habeas corpus, and it would be a misuse of that writ to so extend it."

These utterances being synopsized, announce:

First, that a person arrested and imprisoned on a capias issued by a court competent to try him for the offense with which he is charged, *can not prior* to his trial, have inquiry made into the *legality* of his imprisonment, nor can he be released from such imprisonment through the writ of habeas corpus.

Second, that *after* he has undergone his trial in the tribunal possessed of jurisdiction, in criminal causes, and been convicted of and sentenced for the offense with which he is charged, he still can not have the legality of the proceedings nor the resultant judgment inquired into by that writ.

In other words, in the circumstances already set forth, he

can not be released on habeas corpus, neither *before* nor *after* final judgment.

Third, but it is *graciously* added, however, that, if the prisoner be refused bail in "a bailable case," "where he is held in custody under process awaiting trial or under commitment awaiting the action of the grand jury," "he may be brought before a court or judge under this writ and admitted to bail to await his trial," etc.

Fourth, but habeas corpus does not lie except for the purpose of admitting to bail, and "was not designed . . . . to interfere with the due procedure in a court of competent jurisdiction."

Fifth, that one tried under and convicted as for a crime, under the judiciary system of this State, is entitled to have an appeal or writ of error to review the proceedings which resulted in such conviction, and in such appeal or on such error brought he may have the constitutionality of the statute under which he was convicted, passed upon by the judgment of the highest court in the State. And if the point he desires reviewed goes to the jurisdiction of the trial court, certiorari is the only appropriate remedy, and by it the record may be brought up and quashed. If with all these available remedies before him, the condemned man prefers "*to pine in prison,*" he himself is alone to blame. Habeas corpus has no function to perform in his case, and to extend it so far would be a misuse of the writ.

From these premises I propose to draw my own deductions, and those deductions will, I apprehend, be based upon abundant authorities and what I consider sound reasoning; but it would be superfluous to say that such authorities and such reasoning will widely differ from the aforesaid epitome of the doctrine I shall now endeavor to combat.

Lord COKE in his day called habeas corpus *festinum remedium.* Were he present to-day before us, he would

quickly conclude that the writ had nothing left in it either speedy or *remedial; only a bare authority to take bail.*

Professor Minor, on the subject now under discussion, says: "The writ of habeas corpus is the most celebrated writ in the law. Several kinds are made use of by the courts, either for the purpose of removing prisoners from one court into another, for the more easy administration of justice, or for the purpose of formally inquiring into the legality of an imprisonment, and discharging the party if it be found that he is restrained of his liberty without due warrant of law. It is of the latter, the great and efficacious writ in all manner of illegal confinement, of *habeas corpus ad subjiciendum,* to which reference is now made. It is awarded with us when one is alleged to be illegally detained under color of the authority of the United States, or in violation of the Federal laws or treaties, by the district or circuit courts of the United States, or by any judge of either of those courts in vacation; and in all other cases of alleged illegal detention, by any circuit, corporation, or county court of the State, or any judge of either in vacation. It is directed to the person who is supposed to have the party in whose behalf the complaint is made is custody, and commands him to produce the body of the prisoner, with the day and cause of his caption and detention, *ad faciendum, subjiciendum, et recipiendum,* to do, submit to, and receive whatsoever shall be considered in that behalf." [4 Minor's Institutes, pt. 1, pp. 9 and 10.]

In another place, still treating of the same subject, the eminent author says: "This great and important writ, which is aptly denominated the *citizen's writ of right,* is the means whereby an imprisonment, or restraint of liberty, alleged to be illegal, may be formally inquired into, and if found to be illegal, the party may be finally discharged. The person having in his custody the party in whose behalf the complaint is made, is required by the terms of the writ, *forthwith* to have

the body of such party before the court or judge to do, submit to, and receive whatever shall in that behalf be adjudged. The writ is not designed to test anything but the sufficiency of the authority under which the prisoner is held." [4 Minor's Institutes pt. 1, pp. 405, 406.]

Of course, this writ can not serve the purpose of an appeal or writ of error, for mere error or irregularity is neither affected nor cured by it. But aside from errors, etc., the peculiar functions of the writ are as exemplified in the following extracts:

"The *habeas corpus ad subjiciendum* is that which issues in criminal cases, and is deemed a prerogative writ, which the king may issue to any place, as he has a right to be informed of the state and condition of the prisoner, and for what reasons he is confined. It is also in regard to the subject deemed his writ of right, that is, such an one as he is entitled to *ex debito justitiae,* and is in nature of a writ of error to examine the legality of the commitment; and therefore commands the day, the caption, and cause of detention to be returned. [4 Bac. Abr., A., p. 564.]

"It is said in general, that upon the return of the habeas corpus the cause of the imprisonment ought to appear as specifically and certainly to the judges, before whom it is returned, as it did to the court or person authorized to commit. For, if the commitment be against law, as being made by one who had no jurisdiction of the cause, or for a matter for which by law no man ought to be punished, the courts are to discharge him, and therefore the certainty of the commitment ought to appear." [Ib., B. 10, pp. 585, 586.]

Chitty says: "The *habeas corpus ad subjiciendum* (so termed from the language of the writ, to undergo and receive all such things as the court shall consider of the party in that behalf) issues in criminal cases, and is deemed a prerogative writ, which the king may send to any place, he having a right to

be informed of the state and condition of every prisoner, and for what reason he is confined. It is also, in regard to the subject, deemed his writ of right, to which he is entitled *ex debito justitiae*, and is in the nature of a writ of error to examine the legality of the commitment, and therefore commands the day, the caption, and the cause of detention, to be returned." [Crim. Law, 119.]

"The true test of jurisdiction is, whether the relator is detained or imprisoned without legal authority? The source from which the imprisonment emanates, or the authority by which it is sought to be enforced, operates as no barrier to the allowance and validity of the writ. The power exists to make inquiry into the cause of the caption and detention, and it may be pursued without regard to the origin of the imprisonment, or the condition of the imprisoned." [Ex parte Collier, 6 Ohio St. 55.]

COULTER, J., aptly observes: The "writ of *habeas corpus ad subjiciendum* is the prerogative of the citizen; the safeguard of his person, and the security of liberty—no matter where or how the chains of his captivity were forged—the power of the judiciary in this State is adequate to crumble them to dust, if an individual is deprived of his liberty contrary to the law of the land." [Com. ex rel. v. Fox, 7 Barr 336.]

In Cox v. Hakes, 15 App. Cas. (H. L.) loc. cit. 514, Lord HALSBURY said: "For a period extending as far back as our legal history, the writ of habeas corpus has been regarded as one of the most important safeguards of the liberty of the subject. If upon the return to that writ it was adjudged that no legal ground was made to appear justifying detention, the consequence was immediate release from custody. If release was refused, a person might make fresh application to every judge or every court in turn, and each court or judge was bound to consider the question independently and not to be

influenced by the previous decisions refusing discharge."

Instances will now be given from leading text-writers, touching this subject.

"It will be readily seen that the question before the court is not to ascertain whether the plaintiff has committed a crime, but to inquire into and determine whether he is lawfully held in custody by the defendant who has charge of him. The legality of the process by which he is held, the power of the court to issue the process, if any, and the right of the defendant to hold the plaintiff thereunder, all arise. If the plaintiff is charged with crime, this proceeding tests the jurisdiction of the court issuing the process; the constitutionality of the statute creating it; the process itself; the legality of the judgment or any right or immunity of the plaintiff under the Constitution itself. Therefore the writ tests not only the legality or power of the court to issue process, but also the process, and the power of the Legislature under the Constitution to pass the act under which the prisoner was convicted, as well as any other right or immunity guaranteed by the Constitution and appearing by the record to have been denied him. Hence, if for any legal cause so appearing the court had no power to render the judgment it did render, the writ will lie. If, therefore, the defendant in a criminal proceeding was protected by a constitutional provision forbidding his being placed twice in jeopardy for the same offense, he may avail himself of the writ, although the court had jurisdiction over the subject-matter and case; yet, because it has no constitutional right under the facts shown of record to enter the judgment, it is void. Therefore, when the sentence exceeds the jurisdiction of the court, there is no legal authority to hold the defendant under it. Where he has been once put in jeopardy for the same offense, and this fact appears of record by plea confessed by demurrer, the court has no jurisdiction to sentence him again. If, however, the court misconstrues the statute, thereby rendering him liable

when he should not be, such misconstruction is mere error of law and can only be rectified on appeal; the one being an error in judgment of the court, like receiving improper evidence; the other being the exercise of the powers of the court going directly to its jurisdiction and forbidding the rendition of any judgment whatever under the record." [Brown on Jurisdiction, sec. 98.]

"Where the sentence given is beyond the jurisdiction of the court, because contrary to the provisions of the Constitution, which bounds and limits all jurisdiction, the writ of habeas corpus will lie. . . . . Therefore, whatever goes to the jurisdiction or authority, statutory or constitutional, and affects the power so as to destroy the judgment, is an avoidance of the judgment and comes within the writ and its functions. . . . . A trial which denies or fails to secure to the accused the benefit of these provisions would not be a trial under due process of law. . . . . As before remarked, irregularity in the trial does not enter into the hearing under this writ, for the judgment must, in order that the plaintiff shall be discharged because of illegality, become a nullity. . . . . The writ of habeas corpus is not, therefore, in its nature one that is intended to review the facts already tried or instructed for trial to a tribunal that by statute is authorized to hear, try and determine a case, but it is rather a legal proceeding to test the legality of the trial, and in this respect the power of the court is reviewed, down to the moment of and including the entering of the judgment. The law giving the power is under review, also the law under which the petitioner for the writ is convicted, the legality of the trial, and every subject going to the making up of the jurisdiction, and particularly the judgment itself. It does not act as a writ of error but of right, and its high functions are to see that the law is maintained. It is not to destroy the law but to fulfill its requirements; and the question which is considered.

Vol 160 mo—17

is, in the main, whether the applicant for the writ, the plaintiff, is unlawfully, or rather illegally, restrained of his liberty without due process of law.    It is a law test and trial, but not one of fact."    [Ib., secs, 101, 102, 112, 114.]

"The writ of *habeas corpus ad subjiciendum* is a high prerogative writ, summary in its character. . . . . This writ is a remedy for every illegal imprisonment. . . . . It was not framed to retry issues of fact, or to review the proceedings of a legal trial.    It can not be used as a substitute for an appeal, or for a writ of certiorari.    Errors and irregularities in procedure, not going to the question of jurisdiction, are not reviewable on habeas corpus. . . . . It is not in the power of the Legislature to take away the right of any one to the writ of habeas corpus, or the remedy furnished by it, or to limit, restrict, abridge, impair or suspend it in any degree, except in the exigencies specially provided for in the Constitution.    The authority of all other writs must yield to the authority of the writ of habeas corpus." [Church, Habeas Corpus (2 Ed.), sec. 87.]

In another section, when speaking of the prisoner's impeaching the legality of his imprisonment, the learned author says:    "But this he may do in various ways.    He may show that the jurisdiction of such court or officer has been exceeded. . . . . that the process is defective in some matter of substance required by law; that though proper in form, it has been issued in a case not allowed by law; . . . . that the process is not, in reality, authorized by any order, judgment, or decree of any court, or by any provision of law. . . . . Mere errors and irregularities of procedure, however, not affecting the question of jurisdiction, are never reviewable on habeas corpus; and where the process is regular and valid upon its face, there is no doubt that a preponderance of authority supports the rule that inquiry, on habeas corpus, will go only to the question of jurisdiction. . . . . . But jurisdiction is always an open question, and may be inquired into

by any court or judge competent· to issue the writ. Thus, the prisoner may be discharged on habeas corpus, either before or after judgment, where the statute or ordinance under which the proceedings are inaugurated against him, is unconstitutional,·as this is a jurisdictional defect; or where the complaint or commitment does not charge any crime known to the law; or where a commitment to answer has been made by a magistrate after a preliminary examination and after the defendant has filed an affidavit that he could not have a fair and impartial trial or hearing before him, which under the statute would disqualify such magistrate from hearing the case." [Ib., sec. 236.]

Elsewhere, he says: "An indictment must contain the statement of an offense known to the law, and, under the rules well settled by judicial decision that this may be inquired into, if the court or judge determines that it does not, the prisoner must be discharged as a matter of right, particularly in those States where a statute provides that he shall be discharged 'when the process, though proper in form, has been issued in a case not allowed by law.' The better opinion is that not only after indictment, but even·after conviction, the courts will, by means of habeas corpus, inquire into the constitutionality of the law under which the applicant for the writ was indicted and tried and, if the law is determined to be unconstitutional, the prisoner will be discharged, no matter what may be the status of his case." [Ib., secs. 245, 245a. And see, also, Ib., secs. 81, 349, 351, 352.]

The writer of an elaborate work, discussing the effect and operation of the writ, remarks:

"It is a writ the object of which is to liberate those who are unlawfully imprisoned, whether by the action or under the order or judgment of a court, or without the forms of law. The right to the writ exists independently of and can not be

taken away by statute.    The right is guaranteed by the Constitution of the United States and of the States. . . . . .

"The causes for which the writ may issue have been increased, and the extent to which courts may go in investigating such causes have been extended and enlarged quite materially in some of the States.    But in none has the writ been made less effective or the causes for which it may issue been diminished.

"The general rule is that the writ is jurisdictional, when directed to a court or judicial officer, and can only be used to inquire into the jurisdiction of such court or officer, and that it can not be used as a writ of error or appeal for the purpose of inquiring into mere errors or irregularities; nor can the court determine, under the writ, whether the acts alleged constituted the offense charged or not, or the sufficiency of the evidence to warrant the imprisonment of the party seeking the writ.

"But the inquiry is not confined to the question whether the court had jurisdiction of the cause and of the defendant, but may be extended to the question whether the court had power to render a particular judgment or impose the particular penalty inflicted. . . . . If the court has acted without jurisdiction or has transcended its powers, the petitioner will be discharged from imprisonment as a result of its unauthorized action, as well after as before final judgment." [Works, Courts and their Jurisdiction, secs. 82, pp. 639, 640, 641, 647.]

In reference to the jurisdiction incident to the issuance of this writ, it is observed that:    "In a general sense this jurisdiction is appellate in its nature.    The expression 'appellate jurisdiction,' has been defined to be 'the power of one tribunal to review the proceedings of another.' . . . . It is not, strictly speaking, a power of revision, which includes properly the power to affirm or reverse the judgment or order and so establish or destroy it; but a power to arrest the execution of a void

judgment or order. It acts directly on the effect of the judgment, to-wit, the imprisonment; but only collaterally on the judgment itself. The jurisdiction, therefore, under the writ of habeas corpus over the judgment or order relied on to justify the imprisonment, is only collaterally appellate. . . . . If it appears clearly that the fact for which the party is committed is no crime, . . . . the court discharges. . . . . A proceeding defective for irregularity and one void for illegality may be reversed upon error or certiorari; but it is the latter defect only which gives authority to discharge on habeas corpus. . . . . *Illegality* is, properly, predicable of radical defects only, and signifies that which is contrary to the principles of law, as distinguished from mere rules of procedure. It denotes a 'complete defect in the proceedings.' . . . . When the cause of commitment is shown and the prisoner is found in custody of a court of competent jurisdiction, not illegally asserted, the writ has fulfilled its office and the prisoner should be remanded." [Hurd, Habeas Corpus, pp. 324, 325, 326, 327, 328, 333.]

In a recent recognized work of merit, it is stated: "The writ of habeas corpus is a high prerogative writ known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause. It is in the nature of a writ of error to examine the legality of the commitment. It is the proper remedy for every unlawful imprisonment, both in civil and criminal cases. The writ is the remedy which the law gives for the enforcement of the civil right of personal liberty. While it becomes necessary oftentimes to resort to it, where enforcement of the laws for the punishment of crime has been attempted, yet the proceeding under the writ is not to inquire into the criminal act which is complained of, but the right to liberty notwithstanding the act. . . . .

"The writ of habeas corpus has not been given for the purpose of reviewing judgments or orders made by a judge or court or officer acting within their jurisdiction. To put it to

such a use would be to convert it into a writ of error, and confer upon every officer who has authority to issue the writ appellate jurisdiction over the orders and judgments of the highest political tribunals in the land. It is well settled that habeas corpus can not be put to such use, and that its functions, where the party who has appealed to its aid is in custody under process, do not extend beyond an inquiry into the jurisdiction of the court by which it was issued, and the validity of the process upon its face. . . . . It is only when the court pronounces a judgment in a criminal case which is not authorized by law under any circumstances in the particular case made by the pleadings, whether the trial court has proceeded regularly or otherwise, that judgment can be said to be void so as to justify the discharge of the defendant held in custody by such judgment. . . .

"If the court which renders a judgment has not jurisdiction to render it, either because the proceedings or the law under which they are taken is unconstitutional, or for any other reason, the judgment is void, and may be questioned collaterally, and a defendant who is imprisoned under and by virtue of it may be discharged from custody on habeas corpus. . . . . As the laws of Congress are only valid when they are within the constitutional power of that body, the validity of the statute under which a prisoner is held in custody may be inquired into under a writ of habeas corpus as affecting the jurisdiction of the court which ordered his imprisonment. . . . .

"The mere decision of a tribunal, however, that it has authority to try and determine a case, when no such power exists in the court, does not give it the power. Its judgment may be questioned anywhere for want of jurisdiction. The jurisdiction of a court can never depend upon its decision upon the merits of a case brought before it, but upon its right to hear and determine it at all." [1 Bailey on Jurisdiction, secs. 310, 311, 322, and 2.]

In illustration of the quotation made from the section last

cited, mention is made in another section, of a case which arose in Pennsylvania, where an unsigned paper purporting to be a last will was admitted to probate by a decree entered to that effect, and in that State such a decree is held judicial and conclusive, after five years have elapsed, as to the real estate disposed of by it, and no appeal taken; and no appeal was taken in that case. Thereupon plaintiff, claiming title under the will, brought ejectment and recovered in the trial court, but on appeal to the Supreme Court it appeared on the record, from the testimony of the subscribing witnesses, that *"the deceased died before he signed and sealed the same;* and further, that the deceased was, *at the time of so making his will,* of sound and disposing mind and memory,"* etc. And upon this it was ruled that on the foregoing facts the register was without jurisdiction, and his decree admitting to probate the unsigned writing, void, Justice WILLIAMS saying: "If the court has no jurisdiction it is of no consequence that the proceedings have been formally conducted, for they are *coram non judice.* If such want of jurisdiction appear upon the record, it can be taken advantage of at any time and in any court where the conclusiveness of the judgment is the subject of judicial inquiry. The reason for this is found in the fact *that the record of the judgment bears on its face the proof of its illegality, and shows the want of power in the tribunal to render it.* When it is offered as a conclusive adjudication between the parties, an inspection shows it is not, because the court had no power to make an adjudication. The adjudication of the register was conferred by statute. Within these limits his decrees are conclusive. Outside of them he is without any authority to make a decree, and his decree if made is a nullity." [Wall v. Wall, 123 Pa. St. 545, cited, 1 Bailey on Jurisdiction, sec. 10.]

Speaking again, in another place, of the question of jurisdiction as affected by that of unconstitutionality, the same author expresses himself thus: "It is conceded as a general

rule that a court of general jurisdiction has the power to decide all questions of law that may arise in the particular case. That the question of the validity of any law that may be applicable must be decided, when the question is raised, in the first instance by the court which is proceeding with the trial. It is purely a question of law, yet the courts quite generally hold the doctrine that proceedings under an unconstitutional law are absolutely void; that the act, being void, has no effect to confer jurisdiction; that the power to determine is wanting; therefore, any decision the court may make is without the power to make it, and must be void." [1 Bailey on Jurisdiction, sec. 15.]

In a very comprehensive text-book, the nature, scope and functions of the writ in question are exhaustively treated. Among other things it is said:

"The writ of habeas corpus is a high prerogative writ, given by the common law, and of authority paramount to that of all other writs, for the purpose of effecting a speedy release of the subject or citizen, whether an infant or a person of full age, from any illegal restraint of his liberty. . . . . The writ issues *ex debito justitiae,* as a matter of right, but not as a matter of course, for the authorities are uniform in holding that sufficient probable cause must be shown to enable the court to form some judgment in the case, and if it appears from the petitioner's statement that there is no sufficient ground for his discharge, the court should not issue the writ. . . . . A person who is in custody under a warrant or commitment on a criminal charge, before indictment, may have a writ of habeas corpus for the purpose of an inquiry into the legality of his detention and to procure his release, in case it appears that he is illegally detained. The grounds, among others, on which a discharge will be granted under this head are want of jurisdiction or power in the committing magistrate to make the commitment; failure to indict for the offense charged within the

time prescribed by statute; that no criminality is attached by law to the acts charged; and radical defects in the commitment. .... Even after indictment has been found, and the party is held in custody to respond to the charge against him, he may still question the legality of such detention by means of the writ of habeas corpus, and may procure his discharge if it appears that he is illegally detained, as where the offense charged was not committed within the jurisdiction where the indictment was found, or where the court in which the prosecution is pending has no jurisdiction of the offense charged; but no matter of defense on the facts, however clear, can be thus determined in advance. . . . . . A person who is in custody by virtue of any judgment or order of court may be discharged therefrom on habeas corpus in any case where the court, whether it was one of general or of limited jurisdiction, did not for any reason have jurisdiction of the person of the defendant, or of the subject-matter involved, civil or criminal, so that the judgment would be held void on collateral attack, or if the process under which the party is in custody is void for any reason. . . . . . A conviction under an unconstitutional statute is generally considered void, so that the prisoner may be discharged from custody under it by habeas corpus. . . . . . If the acts of which the defendant was convicted are not criminal in law, the judgment is void, and a person who is imprisoned under it may be discharged on habeas corpus. . . . . . But it is only when the court pronounces a judgment which is not authorized by law under any circumstances in the particular case made by the pleadings, whether the trial has proceeded regularly or otherwise, that such judgment can be said to be void, so as to justify the discharge of the defendant held in custody by it."    [15 Am. and Eng. Ency. of Law (2 Ed.), pp. 154, 155, 157, 161, 162, 163, 166, 169, 170.]

I have thus given in outline, and in substance, the chief points, properties and functions of the writ of habeas corpus,

and of the jurisdiction of the courts in relation thereto and in connection therewith, as set forth by the leading text-writers, as heretofore quoted.

True it is that there are some authorities opposed to the views contained in those I have quoted, but I am persuaded that the great current of authority flows in the direction indicated in the quotations I have made, and that the current of common sense and common reason flows towards the same point of the compass, to say nothing of the sacred principles of personal liberty which the great writ of habeas corpus was designed to protect and preserve against all illegal assaults, whether made by laymen, ministerial or judicial officers, or the orders or judgments of courts.

In discussing the invalidity of acts repugnant to the Constitution, Judge Cooley says with his accustomed force: "When a statute is adjudged to be unconstitutional, it is as if it had never been. Rights can not be built up under it; contracts which depend upon it for their consideration are void; it constitutes a protection to no one who has acted under it, and no one can be punished for having refused obedience to it before the decision was made. And what is true of an act void in toto is true also as to any part of an act which is found to be unconstitutional, and which, consequently, is to be regarded as having never, at any time, been possessed of any legal force." [Cooley, Const. Lim. (6 Ed.), p. 222.]

This quotation was in substance adopted and applied by this court, where it was held that the Act of 1895 being unconstitutional, that the repealing clause of that act which repealed "all acts or parts of acts inconsistent or in conflict with the foregoing section," had no effect on such unconstitutional law, because of its being "a nullity," and, therefore, there was nothing on which the repealing clause could operate because there was no law in existence which could be inconsistent or in con-

flict with an act void by reason of its unconstitutionality. [State v. Thomas, 138 Mo. loc. cit. 99.]

Touching the same thought of the nullity which results in either process or judgment where the statute on which the proceedings are based is unconstitutional, Mr. Justice BRADLEY, in passing judgment in a habeas corpus case, made, among others, the following observations: "The validity of the judgments is assailed on the ground that the acts of Congress under which the indictments were found are unconstitutional. If this position is well taken, it affects the foundation of the whole proceedings. An unconstitutional law is void, and is as no law. An offense created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and can not be a legal cause of imprisonment. It is true, if no writ of error lies, the judgment may be final, in the sense that there may be no means of reversing it. But personal liberty is of so great moment in the eye of the law that the judgment of an inferior court affecting it is not deemed so conclusive but that, as we have seen, the question of the court's authority to try and imprison the party may be reviewed in habeas corpus by a superior court or judge having authority to award the writ. We are satisfied that the present is one of the cases in which this court is authorized to take such jurisdiction. We think so, because, if the laws are unconstitutional and void, the circuit court acquired no jurisdiction of the causes." [Ex parte Siebold, 100 U. S. 371.]

Repeated affirmance of that doctrine has occurred in the Federal Supreme Court. And it was held in that case that the question of the constitutionality of the laws, involved in that case, was good ground for issuance by the Supreme Court, of the writ of habeas corpus to inquire into the legality of the imprisonment under a conviction resting for its basis on such laws.

The doctrine announced in Siebold's case has since been

followed by the Federal courts and most of the State courts, such as has not previously taken the same view of the matter. This is true of Michigan, Nebraska, Texas, Iowa and Missouri.

In Wisconsin, a person convicted and sentenced under an unconstitutional law was discharged on a writ of habeas corpus issued by a court commissioner. [State ex rel. Larkin v. Ryan, 70 Wis. 676.] In an earlier case in that State, In re Elred et al., 46 Wis. 530, RYAN, C. J., in delivering the opinion of the court, after remarking that where the prisoner is held by legal process, the writ of habeas corpus raises only the question of the jurisdiction of the court or officer to issue the process of arrest; held, that inasmuch as the justice of the peace had no authority to cause the arrest of a person for an offense committed in another county, consequently such persons were entitled to their discharge on habeas corpus.

In this State the writ of habeas corpus has frequently issued for the purpose of determining the constitutionality of statutes involved in such litigation: Ex parte Slater, 72 Mo. 102; Ex parte Marmaduke, 91 Mo. 228; Ex parte Swann, 96 Mo. 44; Ex parte Thompson, 117 Mo. 83; Ex parte Wooldridge, 30 Mo. App. 612.

It is asserted in the opinion now being discussed that there was no express ruling made either in Swann's case, nor in Ex parte Marmaduke, nor in Ex parte Thompson, on that point, of the unconstitutionality of a statute rendering all proceedings thereunder void. It was not necessary that this court should in terms state that it had authority to test the constitutionality of a statute by means of a writ of habeas corpus; the very fact that it issues the writ; that it hears and determines the cause, either by discharging the petitioner or else by remanding him, is, in and of itself, an implied declaration of authority to take either alternative indicated. I do not suppose that in the whole range and realm of jurisprudence an instance can be found where a court issuing a writ of replevin, or attachment

or injunction, or habeas corpus, or what not, has seen fit to declare it had authority to do so.

In such circumstances the issuance of the writ is an assumption of jurisdiction thus to issue it, and of the propriety of its issuance.   [Bouldin v. Ewart, 63 Mo. loc. cit. 335; 19 Pac. Rep. 442; State v. Peyton, 32 Mo. App. 522; State ex inf. v. Fleming, 147 Mo. loc. cit. 12.]   "Hence any step taken is an application of the law to all the facts disclosed by the record and necessarily implies an adjudication of the right to take that step."   [Vanfleet's Col. Attack, sec. 62.]

"The assumption of jurisdiction and the exercise of authority is a decision upon the question of notice *without any formal entry declaring the notice sufficient*.   So where an objection was made to the right of the circuit judge to sit in the probate court, he assuming to act, ignoring the objection is an adjudication of his right to do so."   [Ib., and Updegriff v. Palmer, 107 Ind. 181; Jackson v. State, 104 Ind. 516; Landon v. Cornet, 62 Mich. 80.]

But the cases mentioned, do more than impliedly assert the authority to act and the propriety of the court's acting in the premises.   For instance:

In Marmaduke's case, it was held in the majority opinion that section 4031, Revised Statutes 1879, was not in contravention of that provision of the Constitution (section 22, article 2), which gives the right to the accused to have process and compel the attendance of witnesses in his behalf;" and so holding, it was further held that the warden of the penitentiary was guilty of no contempt of the criminal court of St. Louis, in refusing to obey a writ of *habeas corpus ad testificandum* by producing before that court the body of Frederick Whitrock, a convict then in the penitentiary, and the warden having been arrested by the sheriff of Cole county on an attachment issued by the criminal court, was discharged on habeas corpus.   *In that case you will note that whether section 403 was a constitu-*

*tional law, was the hinge on which turned whether the warden was guilty of contempt.* Being held constitutional, his discharge followed. And in that case you will note further that the writ of attachment issued from a court of competent jurisdiction, and was fair and regular on its face, and the warden was arrested on it, and yet this court, notwithstanding that fact, thought the writ of "habeas corpus *had a place in his case."*

In Swann's case it was expressly determined on a demurrer to the return to the writ of habeas corpus, that the local option law was not a local or special law within the meaning of section 53, article 4, of the Constitution, nor a delegation of legislative power, nor did it violate the above section of the Constitution in regard to that provision about enacting a local or special law by the partial repeal of a general law, nor did it contravene section 1 of article 14 of the Federal Constitution. And upon this the return was held sufficient, and the prisoner remanded. If remanded because of the law being held constitutional, it necessarily and inevitably follows that if unconstitutional the prisoner must have been discharged.

In Thompson's Case, the point involved was whether section 8849, Revised Statutes 1889, respecting vagrants, was constitutional. That section of chapter 169 authorized that the person whom the jury fround to be a vagrant, should be kept in the custody of the sheriff, and then after three days' notice, hired out at the courthouse door for six months, etc. In the course of the opinion in that case, it is, among other things, said:

"Section 2, of article 1, of the Constitution of this State adopted July 4, 1865, declares: 'That there can not be in this State either slavery or involuntary servitude, except in punishment of crime, whereof the party shall have been duly convicted.' This section has now become section 31 of article 2, of our present Constitution, and is substantially a literal transcript of a like provision contained in the ordinance of

1787, penned by the hand of Thomas Jefferson, and this is in substance section 1, of the thirteenth amendment to the Constitution of the United States. . . . . So that the constituent elements of this case are: Imprisonment, punishment and involuntary servitude without any charge, proof or legislative enactment establishing the act of petitioner to have been a crime. The question then is, can a statute which authorizes such proceedings as are here brought under review, stand before the prohibitions of our State and Federal Constitutions ?" The opinion then concludes: . . . . "The premises considered, we hold that the law under which petitioner is restrained of his liberty contravenes the Constitution of the United States and of this State, and he is therefore entitled to be discharged, and it is so ordered." [In re Thompson, 117 Mo. 83.]

If these cases do not contain express rulings as to the constitutionality of the respective statutes, and recognize habeas corpus as the appropriate remedy in such circumstances, then the power of our vernacular to convey our meaning has been greatly curtailed. They certainly did not follow the Harris case, and others of that ilk.

Now I will take up the other cases which have been mentioned, and see what they amount to, and in what they differ from those analyzed above.

Slater's case (72 Mo. 102), involved the constitutionality of section 1804, Revised Statutes 1879, which is substantially identical with section 42, page 848, General Statutes 1865. That section made provision, as was lawful under the Constitution of 1865, that in case a crime were committed in a county and no indictment could be found, it devolved on the circuit judge to have the cause certified to another county, where an indictment could be found. [Sec. 12, Art. 11, Constitution 1865.]

In that case it was determined that though section 1804

was a valid law under the Constitution of 1865, yet in consequence of the change effected by the Constitution of 1875, the Constitution of 1865 was abolished by the Constitution of 1875, which made provision only for finding indictments in the county of the crime committed. The indictment in that case showed "upon its face that it was preferred by a grand jury of Scotland county, and charged the offense not to have been committed in said county, but in Clark county."

And concerning section 1804, supra, in delivering the opinion, this court remarked: "We are of opinion that this statutory provision is utterly null and void, for the reason that it undertakes to deprive a person of the constitutional right conferred upon him by section 12, supra, of the Constitution, which section, as we have shown, gives to every person charged with a felony, before he can be tried, the right to have the charge preferred in an indictment found by a grand jury of the county where the offense was committed. While the Constitution gives this right to every person, the statute in question takes it away and denies it to some persons. While the Constitution declares that a person charged with a felony can only be tried after an accusation has been made upon the oaths of the grand jury of the county where the crime was committed, the statute in question declares, on the contrary, that a person charged with a felony may be tried upon an accusation preferred upon the oaths of the grand jury of another and different county than the one where the crime charged was committed. The statute being thus in direct conflict with the Constitution, which can in no way be reconciled, must, therefore, fall and be considered as no law."

And upon the ground of the unconstitutionality of section 1804, the prisoner was discharged on habeas corpus.

The above case announces the very doctrine ruled in Siebold's case, heretofore cited.

In Bethurum's case (66 Mo. 545) the prisoner would

have been discharged on habeas corpus but for the passage of a law which permitted the re-sentencing of the prisoner, and this was done, whereby the excess of punishment was obviated and the prisoner was remanded. But the writ was granted in that case in order to test the constitutionality of that remedial and error-correcting law.

In Page's case, the excessive sentence proved fatal on habeas corpus; and the prisoner was discharged. This, of course, occurred prior to the curative act above mentioned, and the discharge of the prisoner was ordered by reason of the fact that the jurisdiction of the court had been exceeded, etc., and by reason of the further fact that the process was not authorized by any provision of law. [Wagn. Stat., sec. 35, p. 690.] And in that case the court is careful to point out that if the fact of excess of jurisdiction lay *dehors* the record, this court could not interfere in the manner prayed; but inasmuch as the excess of sentence, etc., appeared on the face of the record, habeas corpus was the proper remedy.

Ex parte Snyder (64 Mo. 58) was one where the court was organized by a valid law, but the law of its organization was necessarily, though not in terms, abolished by the adoption of the Constitution of 1875, to which the law establishing the probate and criminal court of Cass county became repugnant; and after that the trial of Snyder occurred, and upon this it was held he was entitled to his discharge on habeas corpus, as there was no statute left in existence establishing the court aforesaid.

But if it be true as stated in Siebold's case, that "an unconstitutional law is void and is as no law," and if as stated in Slater's case, a similar statute is to be "considered as no law," how can Snyder's case being a conviction in a court organized under an abolished law, be made to differ from a conviction in a court validly organized, but based on an unconstitutional

Vol. 160 mo—18

law ?   Point out the difference if you can.   In Harris' case
(47 Mo. 164) it was held that an arrest of a person under an
unconstitutional law could not be reviewed  or  relieved  by
habeas corpus, and this on the ground that our statute on that
topic contained no provision for that kind of a case, referring
to section 35, Wagner Statutes, p. 690.   That section is now
section 3578, Revised Statutes 1899.

But in that case the court did not consider, as it did after-
wards, in Page's case, that if the arrest was "not authorized by
.... any provision of law," there the prisoner was entitled to
his discharge.   Nor was it considered that if the statute were
unconstitutional, there could not be *any provision of law* for
his arrest.   But the whole case was passed over lightly without
any reference to, or citation of, authority, and upon that case
in all its meagerness, rests Boenninghausen's case (91 Mo.
301).

In 1854, sixteen years before the Harris case was decided,
Chief Justice Shaw had determined that a conviction on an
unconstitutional law was void.   And the Chief Justice dis-
posed of a number of other cases involving in one way or an-
other, the validity of the same law; actions for damages, for
torts in enforcing the law, prosecutions for violating the law,
etc.   Herrick's case came up among the number.   He had
been convicted for a violation of the law, sentenced to and con-
fined in, the common jail.   The papers were "all right and
regular."

Herrick thereupon sued out a writ of habeas corpus, and
his cause was heard and determined along with the rest.   Of
that the Chief Justice said:

"In Herrick's case, a question was made by the Attorney-
General whether the prisoner could be relieved on habeas cor-
pus, even if the conviction is wrong; and whether his remedy
is not by writ of error or certiorari ; on the authority of Riley's
case (2 Pick. 172).   We take the distinction to be this: When

the proceedings are irregular or erroneous, if the court or magistrate has jurisdiction, the judgment is voidable only, and not void; and of course must stand good until reversed or annulled in a proper course of proceeding, by a court having authority to revise and annul it. But where it appears, on the face of the proceedings, that the magistrate had no jurisdiction, the proceedings are wholly void, the commitment is without authority, and the party committed is entitled to be discharged from his imprisonment *without reversal of the judgment.*

"The case being rightly before us, the court are all of opinion that, for the reasons already given, that section of the law under which the conviction was had is unconstitutional, and therefore the judgment is void, and the prisoner is entitled to be discharged from custody." [Herrick v. Smith, 1 Gray 49.]

And in one of the associate cases, Fisher v. McGirr, it was ruled that where an officer acted on a warrant apparently regular on its face, that though, ordinarily, this would be a full protection to the officer making the seizure, yet this would not be the case where, owing to the statute being unconstitutional the magistrate had no jurisdiction and consequently "the process was not merely voidable but wholly void; the officer taking property under it has no authority, and is therefore liable to an action of trespass. . . . .

"The law relied on for a justification, being void, gave the magistrate no jurisdiction and no authority to issue the search warrant, the officer can not justify the seizure under it, and therefore an action lies against him for the taking." [1 Gray, 45, 46.]

You will observe in the above case that the Attorney-General suggested a doubt as to whether habeas corpus would lie, but this doubt was promptly solved by the Chief Justice saying that as "the commitment is without authority, the party committed is entitled to be discharged without reversal of the judgment."

In 1852, a similar ruling as in Herrick's case had been made on circuit by that eminent judge, B. R. CURTIS, to the effect that if a statute is in conflict with the Constitution, it confers no jurisdiction on the magistrate who acts under it. [Greene v. Briggs, 1 Curt. C. C. 311.]

But there is an earlier original by-way of authority on the point in hand, than any of the cases I have recently mentioned. I have already quoted this sentence: "For if the commitment be against law, as being made by one who had no jurisdiction of the cause, or for a matter for which by law no man ought to be punished, the court are to discharge him." [4 Bac. Abr., B., 10, p. 585.] Chief Baron GILBERT is thought to be the author of that sentence. The latter part of the rule there quoted, is confined to cases of clear and manifest want of criminality in the matter charged, such as render the proceedings void.

The authority commonly cited as pertinent to this point is Bushell's case, decided in 1670. There twelve jurymen, Bushell among the number, were convicted "for giving a verdict against full and clear evidence" (whereby William Penn and others, charged with meeting in a conventicle, were acquitted). Bushell and his associates being imprisoned for failure to pay their fines, sued out habeas corpus, and were discharged, on the ground that their conviction *was void;* that jurymen could not be indicted for rendering any verdict they choose. [Bushell's Case, Vaughan, 135; s. c., 6 Howell's St. Tr., 999, T. Jones, 13.]

So that it is at once evident that Siebold's case announced no new doctrine to that last cited, unless there be distinction to be taken between an absence of a law for doing a certain thing, and an unconstitutional law, which is no law at all, professedly giving permission to do that thing.

Our right to the writ of habeas corpus had its origin in the common law, and though the Legislature may to some

extent regulate the issuance of the writ, yet it can not take away the right of anyone to the writ or the remedy furnished by it, or to limit, restrict, abridge, impair or suspend it in any degree, except in the exigencies specially provided for in the Constitution.    The authority of all other writs must yield to the authority of the writ of habeas corpus.    [Church, Habeas Corpus, sec. 87.]

But our Constitution provides that:

"The privilege of the writ of habeas corpus shall never be suspended."    [Art. 2, sec. 26.]

Treating of this question, Judge COOLEY said:

"When the Constitution gave this court jurisdiction of the writ, I think it conferred the same full powers upon the court, as representing the sovereignty of the people, which the Court of King's Bench possessed as representing the Crown of England. Our jurisdiction does not depend upon the statute, and the main purpose of that, here as in England, is to compel the performance of judicial and ministerial duties.    Chancellor KENT says (2 Kent, 27):    'The right of deliverance from all unlawful imprisonment, to the full extent of the remedy provided by the Habeas Corpus Act (of 31, Ch. II), is of common right.'    And by this he means, as the context shows, without regard to the cause of imprisonment, so that it be unlawful. The statute does not give the writ, but renders it more effectively and actively remedial.    I therefore attach no special importance to the particular wording of the statute where it speaks of the cases in which the writ is to be issued........ If the statute lacks comprehensiveness, it may be that the same opportunities are afforded for evasions of duty by courts that existed in England before the statute 31, Charles II, but until a disposition to evade duty shall be manifest, it will not be important.    The common-law jurisdiction is ample.    As it came from no statute, it is not confined in its scope to any prescribed limits, but is co-extensive with the cases to which its principles

can be applied, and in which it can afford a remedy. I am aware of nothing which limits the power of the court upon this writ, but its capacity to give relief in the particular case in accordance with the settled rules which govern this mode of proceeding. I know of no other test that can have determined its jurisdiction at the common law; and while the law holds the right to personal liberty in the same high regard as now, the same test will probably continue to be applied." [In the Matter of Jackson, 15 Mich. 417.]

Works says: "The right to the writ exists independently of and can not be taken away by the statute." [Courts and Jurisdiction, p. 639, sec. 82.]

Prof. Minor says "the guaranties and securities" which surround this writ "are not susceptible of being evaded or modified by the Legislature; that is, *not legally.*" [4 Minor's Inst., Pt. I, p. 416.]

The statute of New York concerning this writ underwent elaborate discussion in People ex rel. v. Liscomb, 60 N. Y. 559, by ALLEN, J., who said:

"The prohibition of the forty-second section of the habeas corpus act, forbidding the inquiry, by the court or officer, into the legality of any previous judgment, decree or execution specified in the twenty-second section, does not and can not, without nullifying, in good measure, the provisions of that and other sections of the act, take from the court or officer the power, or relieve him from the duty of determining whether the process, judgment, decree or execution emanated from a court of competent jurisdiction; and whether the court making the judgment or decree, or issuing the process, had the legal and constitutional power to give such judgment, or send forth such process. It simply prohibits the review of the decision of a court of competent jurisdiction. . . . . . . . The inquiry is, necessarily, in every case, whether the process is void, and the officer or court having jurisdiction of the writ must pass upon

it. If a process good in form issued upon a judgment of a court having jurisdiction, either general or limited, must in all cases be assumed to be valid until the judgment be reversed upon error, the remedy by the writ of habeas corpus will be of but little value." And that the relief afforded at common law by 'this, the greatest of all writs,' is, under the Constitution beyond the pale of legislative discretion and should not be shorn of its power and its glory by a subtle and metaphysical interpretation; rather should it receive a liberal construction, in harmony with its grand purpose, and in disregard, if need be, of technical language used."

And in regard to the construction to be placed on the statute it is not to be presumed that the Legislature intended by the use of general words therein to defeat the very object and purpose of the writ of habeas corpus, which, according to all the authorities, as already quoted, "is in the nature of a writ of error to examine the legality of the commitment." [1 Chitty, Cr. L., 119; 1 Bailey Juris., sec. 310.] If all opportunity for examination into the legality of the commitment were to be foreclosed by bare, formal recitals in writs or judgments, such "pitiful evasions" would often be resorted to in order to balk the operation of *"the Great Writ."*

In this writ, legality and jurisdiction are inseparably blended; whatever shows legality to be non-existent, shows jurisdiction occupying the same vacuum. [See text-books, supra.]

But in this case inasmuch as this cause has not proceeded to judgment, the words of section 3578, will be sufficient for· the purposes of this case, to-wit: "Where the process, though in proper form, has been issued in a case or under circum-stances not allowed by law." . . . . . . ."Where the process is not authorized by any provision of law." [Ex parte Page, supra.]

Many of the cases upholding the doctrine that habeas corpus lies to question legality of process and judgments issued,

entered under unconstitutional laws will be found in a note to section 83, Church, Habeas Corpus.

Ex parte Mitchell, 104 Mo. 121, was correctly decided. The subject-matter of the proceeding which resulted in the judgment in that case was the local option law; but as the evidence as to whether that law had been adopted or not, did not appear in the record, there was nothing left for this court to do but deny the writ. In re Wooldridge, 30 Mo. App. 612, the prisoner was very properly discharged on habeas corpus because it was apparent of record that the local option law was adopted at a void election. In Ex parte Bedard, 106 Mo. 616, an affidavit was filed which disqualified the judge of the court of criminal correction, but who nevertheless committed the defendant, and it was ruled that the judge having been disqualified had no *jurisdiction* to imprison defendant, and so he was discharged on habeas corpus.

That case is, in effect, the same as one where the statute involved is unconstitutional; for, in either case jurisdiction is absent. In re Flukes, she was arrested on a charge and was discharged by us on habeas corpus, on the ground that the statute was unconstitutional. [157 Mo. 125.]

So far as concerns the case of State ex rel. v. Dobson, 135 Mo. 1, it suffices to say that no question of an unconstitutional law was presented, and therefore it would have been wholly *obiter* to have discussed such a point in that case.

Ex parte Mallinkrodt (20 Mo. 493), was a case where a witness required by a subpoena *duces tecum* to produce books and papers before a notary, refused to do so, and was committed to prison. The notary's authority only extended to commitments for contempts in failing to give *testimony*. Consequently, as authority was lacking to the notary in *that particular case* to commit, the petitioner was discharged on habeas corpus. It can make no difference, in point of principle, what

ground causes the absence of authority; it suffices to show such absence, and when shown, the conclusion follows.

In re Knaup, 144 Mo. loc. cit. 665, it was said: "There is no doubt upon the proposition that a person committed for contempt in disobeying an order, which the court had no legal right to make, may be discharged on habeas corpus."

In State ex inf. v. Bland, it was said: "It is a solecism to say a court of law would enter a judgment punishing a defendant for doing an act that was never made unlawful by any law. [Kansas City v. Corrigan, 86 Mo. loc. cit. 69.]"

In conclusion I have this to say, that if the opinion I have endeavored to discuss is held good law, such a ruling will be in violation of section 26 of article 2 of the Constitution, in that it will *suspend the writ of habeas corpus in this State;* something which that section says, *"shall never be suspended."*

Inasmuch as the statute referred to in the beginning of this opinion, has been held to be constitutional, it follows that the prisoner must be remanded, as heretofore ordered. *Burgess, C. J., Marshall* and *Gantt, JJ.,* concur.